J. ERNIE GASKIN *v.* STATE OF ARKANSAS

5433                                    450 S. W. 2d 557

Opinion delivered March 2, 1970

*Thorpe Thomas & J. Roy Finch, Jr.,* for appellant.

*Joe Purcell,* Attorney General; *Don Langston,* Asst. Atty. Gen., for appellee.

J. FRED JONES, Justice. J. Ernie Gaskin was president of Universal Securities Corporation and was engaged in the stock and bond brokerage business in Arkansas. He employed Bob Scott and Scott's former brother-in-law, Mr. Hanford, as security salesmen. The prosecuting attorney of Lee County, Arkansas, filed fourteen separate felony informations in circuit court against J. Ernie Gaskin charging him with fourteen separate offenses of unlawfully and willfully causing to be offered and sold to O. V. Woodrome, O. N. Stivers, B. S. Rushing, Dr. Mac McLendon, Ruebin White, Jewell White, Ray and Dan Keating, Farmers Gin Company, J. C. and Ruby Neighbors, Charles Earnest Flowers, H. T. Sisk, W. Curtis, Irma Hickerson and Miller Lumber Company unregistered securities, consisting of Americana Motor Inn stock, knowing that the stock was not registered as required by §§ 7 and 21 (a) of the Arkansas Securities Act of 1959, as amended. Gaskin and Universal dealt in the stocks of other corporations but only Americana Motor Inn stock is involved in this case, so all reference to instruments or transactions pertaining to stock or sales of stock, as used herein, refers to Americana Motor Inn stock unless otherwise indicated. The

cases were consolidated for jury trial and Gaskin was found guilty on all counts except in case No. 6787, pertaining to the alleged sale to Farmers Gin Company. Gaskin was sentenced to one year· in the penitentiary on each of the thirteen convictions. He was fined $5,000 on each of twelve counts and $1,000 on one count. Judgment was entered ,on the verdict and on appeal to this court Gaskin relies on the following points for reversal:

"The evidence is insufficient to support the verdict.

The State and Federal Constitutional rights of this defendant have been violated under the Fifth and Fourteenth Amendments to the Constitution of the United States."

This is the second appearance here of this case on appeal, and for a clearer understanding of the disposition we now make on this appeal, we deem it necessary to set out in some detail the disposition we made of the matter on the prior appeal. On the prior appeal, *Gaskin* v. *State*, 244 Ark. 541, 426 S. W. 2d 407, we remanded for a new trial. Gaskin did not contend that the stock was registered but he contended then, as he does now, that the stock did not have to be registered because he had obtained an exemption under § 14 (b) of the Act, which exempts (upon certain conditions) "any transaction pursuant to an offer directed by the offeror to not more than twenty-five (25) persons." Ark. Stat. Ann. § 67-1248 (b) (9) (Repl. 1966). At the first trial the State attempted to anticipate and rebut Gaskin's expected defense by proving that Gaskin had not complied with rules governing what we there called "the 25-offerees exemption." At the first trial the Securities Commissioner testified for the State that his department had adopted a rule requiring an applicant for that particular exemption to file a list of the names of the 25 proposed offerees "so we will know who they are." It was then shown that the names of the fourteen purchasers referred to in the informations against Gaskin were not included in the list of 25 names that Gas-

kin had filed in obtaining the exemption for Americana corporate stock. Upon that proof Gaskin was found guilty as charged on all counts.

Section 21 (b) of the Act [Ark. Stat. Ann. § 67-1255 (b)] provides that a violation of any authorized *rule or order* of the Commissioner is a misdemeanor, whereas § 21 (a) of the Act [§ 67-1255 (a)] provides that a violation of the statute is a felony. At his first trial Gaskin was charged and convicted of felonies in the selling of unregistered securities in violation of the statute, but on evidence that would only support convictions for misdemeanors in violating the rules of the Commission in selling stock to persons other than those named in the exemption list of 25 purchasers. We reversed and remanded for a trial on evidence pertaining to the felony charges. The question was not whether sales were made to individuals who were not on the exemption list. The question was not whether those on the exemption list actually purchased any stock at all, as indeed the most of them did not. The question was whether Gaskin caused to be sold unregistered stock to the individuals he was accused of selling it to, and whether those individual sales were transactions pursuant to offers directed to more than 25 persons.

We are not concerned on this appeal with whether Gaskin caused stock to be sold to any single one, or all of the 25 individuals named in the list he filed with the Commissioner. We are concerned only with two questions. The first question pertains to whether there was any substantial evidence to support the jury finding that Gaskin was guilty of causing unregistered stock to be offered and sold to the individuals as charged in the informations. There is more than substantial evidence to support the jury finding on this point. The next question is whether any of the sales with which Gaskin was charged and convicted were exempt from registration. For an answer to this question the State offered disconnected facts of such variety and nature that each has lost its individual identity as substantial evidence, but becomes submerged and lost in

the profusion of an unidentifiable whole.

The exemption as to 25 purchasers was granted, or became effective, on February 7, 1965. The record shows that *prior to February 7, 1965,* stock was sold to the following individuals on the dates indicated: Mrs. Zack Brooks, January 8, 1965; J. B. Bryant, January 19, 1965; Stanley Bosnick, January 26, 1965; Grover B. Markham, January 27, 1965; W. P. Mixon, January 27, 1965; Charles E. Moore, January 30, 1965; Sandra Lea Stivers, January 30, 1965; Corinne or O. N. Stivers, January 30, 1965; Elgan C. Robertson, February 4, 1965; H. W. or Zola Wilson, February 5, 1965; W. M. Cook, February 6, 1965; Irma Hickerson, February 5, 1965; O. V. Woodrome, January 29, 1965; H. T. Sisk, January 29, 1965, and Charles Flowers, February 4, 1965. Of this group of fifteen purchasers, Gaskin was only charged with causing unregistered securities to be sold to *five of them,* Woodrome, Stivers, Sisk, Hickerson and Flowers. So we have no hesitancy in affirming the trial court judgment as to these five counts. There is substantial evidence, and in fact no semblance of evidence to the contrary, that the sale of stock to these individuals comprised unregistered stock and was consummated before Gaskin or his brokerage corporation ever applied for the twenty-five purchase exemption.

There is no question that stock was offered and sold to more than twenty-five persons and the evidence is clear that the stock was worthless. The evidence is clear that the money and checks given in payment of stock were turned over to, and received by, Gaskin, and that the purchase money paid was never refunded to the purchasers as ordered by the Security Commissioner. We do not try law cases de novo on appeal, but can only examine the record in a criminal case for a determination of whether there is any substantial evidence to sustain the charge upon which the conviction rests. Gaskin was charged with unlawfully causing to be offered and sold certain specific shares of unregistered stock to certain specific individuals, and the burden was on the State to prove the charges made. On this appeal we are

confined to an examination of the record for substantial evidence that Gaskin did cause to be unlawfully offered and sold the specific unregistered shares of stock to the specific individuals alleged in the informations and as found by the jury.

By the simple process of writing a letter and paying $10 to the Securities Commissioner under § 67-1248 (b) (9), supra, Gaskin was able to exempt worthless motel stock from the provisions of the Securities Act in relation to "any transaction pursuant to an offer directed by the offeror to no more than twenty-five persons." The record in this case is not clear at all whether the specific sales to the specific individuals for which Gaskin was charged and convicted, were within or without the twenty-five sale exemption. The problem is obvious, if there had been proof of twenty-five specific sales (exempt under the Act because of the notice) and then the alleged and proven thirteen additional sales, the record would sustain all thirteen convictions, but the record is woefully inadequate in this area.

As to sales *subsequent* to February 7, 1965, the record does not clearly distinguish between subscription agreements and stock certificates. The record does indicate, as testified by Commissioner Jones, that subscription agreements were signed subsequent to February 7, 1965, by John Wesley or Edna Pauline Hart, Alvis Graham, Jr., Nancy Helen Collins, Courtney Langston, Ronald M. or Lois H. Boccarossa, Odie Miller, Joann Carson, Frank Miller, Nell Allen and Howard Taylor. Richard Wofford testified that he was bookkeeper for Universal Securities Corporation, of which Ernie Gaskin was president during 1965; he identified State's exhibit No. 7, which is a group of stock agreements, and testified that they were brought to the Little Rock office by the salesmen, Mr. Hanford and Mr. Scott; that they were given to Mr. Gaskin and passed on to Wofford. He testified that upon receipt of the subscriptions he would issue the stock certificates and that the money for the certificates was turned over to Mr. Gaskin. He says that to the best of his memory

he issued 21 certificates. He says that according to the record of stock certificates kept by the Universal Securities Corporation there were 58 certificates issued, and that this would indicate that someone else issued some of the certificates, or that he was in error in testifying that he issued only 21.

The evidence is not clear as to where the thirteen specific sales upon which Gaskin was convicted fit into the 58 certificates issued from the corporate stock certificate book. Did the thirteen sales for which Gaskin was convicted fall within the first 25 exempt sales, or the remaining 33 sales not exempt? There is no way we can resolve this question from the record before us except by dates on agreements and certificates and assumed consecutive certificate numbers, and this, we hold, does not constitute substantial evidence to sustain a felony conviction.

Much of the testimony offered by the State as to solicitation was vague and indefinite and at the most amounted to circumstantial evidence of a very weak nature. As examples, John Tap Palmer testified that he remembers when the stock was being sold in the area for the purpose of constructing a motel. He says that he was contacted and solicited to buy some of the stock and he believes this occurred in the spring of 1965 at a time when advertisements were being run in the newspapers. He thinks he knew one of the persons who contacted him in regard to the stock. He did not buy any stock and he never does say who the person was who contacted him in regard to the stock. Lyde Benson testified that he recalls the time when there was community talk of building a motel in Marianna. He says he was contacted in regard to the motel but does not know who contacted him; that the person who did contact him held himself out and purported to be, a representative selling stock in the motel. He does not remember whether the name "Americana Motor Inn" was mentioned or not. He remembers it was in the spring of the year, but does not remember which year. He says it was four or five years ago. He does not

know where the man was from who contacted him nor does he know who he represented. He did not buy stock. Ellis Evans testified that he remembers the time when there was the proposal to build a new motel in Marianna. It was in the spring but he does not remember the date. He thinks it was 1965. He says someone offered to sell him stock in the motel but that he does not know who it was that called on him. He did not buy stock and does not know what company the salesman who offered to sell the stock represented. Paul Benham testified that he remembers when there was a proposal to build a new motel in Marianna. His father owned the land on which the proposed motel was to be built. He testified that Mr. Gaskin solicited him to purchase some stock. He did not buy any of the stock, but his father bought 250 shares and his mother bought 250 shares. His father is Paul Benham, Sr. His mother was issued stock certificate No. 19, and his father was issued No. 20 (certificates not in evidence). Billie Gerard testified that he remembers when "the people of Marianna were talking about building a motel." All he remembers about it was that it was to be at the "Y" of Highways 1 and 79. He remembers seeing a sign at the spot advertising the future motel. He says that he was contacted to buy stock in the motel, but does not remember when it was. He did not, at the time, know who contacted him, but does know now. He recognized the salesman as being the gentleman in the blue suit sitting on the back row in the courtroom, but there is no evidence in this record as to what person on the back row had on a blue suit. It was brought out, however, that as between Agents Hanford and Scott, one was short, the other taller, and that witness Gerard was referring to the taller one.

It is difficult to follow the State's trial strategy through the record in this case. After finishing with the witnesses on solicitation, the State proposed to call witnesses who were not "prosecuting witnesses in the sense that none of the sales concerned them except to show that they were people that bought." As examples of the proof offered under this category of witnesses; and as

indicative of the evidence from which we must determine whether or not there is substantial evidence to sustain the convictions, J., B. Bryant testified that he signed a stock purchase agreement on January 19, 1965, agreeing to purchase 5,000 shares of Americana Motor Inn stock. He agreed to pay for the shares in a trade of other stock to Mr. Gaskin. E. M. Collins testified that he subscribed to 500 shares under date of April 20, 1965. He paid for the stock with a check and was issued stock certificate No. 40. Stanley Bosnick subscribed to 1,000 shares on January 26, 1965, and paid $2,000 by check. He purchased the shares from Bob Scott. He was issued stock certificate No. 10, and the stock certificate was dated February 6, 1965. Gaskin was not charged with selling unregistered stock to Bosnick. Dr. Rutledge testified that he recalls an effort to build a motel out at the "Y" north of Marianna, and remembers the sale of stock in regard thereto. He believes that it was in 1965. He was contacted by Mr. Gaskin about purchasing some motel stock, but did not purchase any. A. C. Mahan testified that about the 12th of February, 1965, he subscribed to purchase stock in the Americana Motor Inn Corporation. He testified that he did purchase some stock in the name of Farmers Gin Company in the amount of $200 and was issued a certificate for 100 shares. W. M. Cook testified that sometime during the early part of "February, January, February, March, or along about that time" in 1965, he purchased 500 shares of stock and paid $1,000 therefor. A stock certificate was issued to him on February 6. In answer to the question about when he made the purchase, he answered "Bob Scott," but he never was again asked and did not testify from whom he purchased the stock. Gaskin was not charged with causing unregistered stock to be offered or sold to Cook. Leon Castling testified that he remembers a drive put on to sell stock and thinks it was in 1965. He says there were several people selling and that he was contacted. He says that the party who contacted him represented himself to be an agent selling stock. He did not purchase any stock. He says that a local businessman, Mr. Huffins, and a person representing himself to be a company

representative, came to see him about purchasing stock, but that he did not purchase any. Dr. Mac McLendon testified that on or about the 30th day of April, 1965, he purchased 100 shares of Americana Motor Inn stock for the sum of $200. He says he purchased from Bob Scott and Stan Hanford as agents, and was issued stock certificate No. 46. Dan Felton testified that he does not think he was ever contacted about buying stock. Paul Moore testified that he remembers seeing Ernie Gaskin around Marianna in the spring of 1965. He says that he was not offered any stock but was asked if he was interested in buying some stock. He does not know the name of the company the stock inquiry was made about. Bob Willis testified that he remembers talks and rumors about the plans to build a motel north of Marianna. He does not remember whether that was in 1965 or not. He says he was never contacted about buying stock. O. V. Woodrome testified that on or about the 19th day of January, 1965, he entered into a stock purchase agreement for 500 shares of Americana Motor Inn stock for $1,000. He says that he purchased the stock from Bob Scott and made his check in payment payable to Universal Securities Corporation. H. F. Sisk testified that on or about the 29th day of January, 1965, he purchased 500 shares of Americana Motor Inn stock for $1,000. He says the salesman was Bob Scott, and that he made his check, dated January 29, 1965, payable to Universal Securities Corporation for $1,000. On cross-examination Mr. Sisk testified that he was issued a stock certificate dated February 6, 1965. O. N. Stivers testified that on or about the 30th day of January he purchased 100 shares of Americana Motor Inn stock by purchase agreement dated January 30, and that he purchased it from Bob Scott. He says he made his check payable to Universal Securities Corporation, and that stock certificate No. 26 for the 100 shares was issued to him. He says that three separate stock certificates were issued to him (one to his wife, Corinne, and one to his daughter). Charles E. Flowers testified that on February 4, 1965, he agreed to purchase 250 shares of motel stock for $500. He says that he paid for this stock on February 4, 1965, by check made payable to

Universal Securities Corporation. He says stock certificate No. 16 was issued to him for 250 shares under date of February 6, 1965. W. F. Curtis testified that he purchased 150 shares on April 20, 1965, from Mr. Scott and Mr. Huffins. He said that Mr. Scott did the selling and that he gave a check in payment to Mr. Hanford. Roy Lee Keating testified that on or about the 23rd day of April, 1965, he purchased 100 shares of Americana Motor Inn stock. He says that he paid for the stock and was issued stock certificate No. 43. The date of the stock purchase agreement was April 23, 1965, and the stock certificate was dated July 29, 1965. Reubin White testified that on April 29, 1965, he entered into an agreement to purchase 250 shares of stock for $500; he says that he paid for this stock with a check dated April 29, 1965, payable to Universal Securities Corporation, and that he was issued stock certificate No. 25 for the 250 shares. Mr. White testified that also on April 29, 1965, his wife, Jewell, entered into an agreement to purchase 1,250 shares for the purchase price of $2,500; that the agents for the seller were Stanley Hanford and Bob Scott, and that she paid for the stock with check and was issued certificate No. 45. J. C. Neighbors testified that in May, 1965, he purchased 250 shares by agreement dated May 6, and that he paid for the shares by check made payable to Universal Securities Corporation. Muriel Webster testified that on or about April 30, 1965, the Miller Lumber Co. purchased 2,000 shares and paid for the stock with check in the amount of $4,000 made payable to Universal Securities Corporation. Charles Moore testified that he entered into a stock purchase agreement dated January 30, 1965, under which he agreed to purchase from Bob Scott 50 shares of stock in the amount of $100. He says that he paid Bob Scott $100 for the 50 shares by check. He says the check was made out, he thinks, to Universal Securities Corporation, and that he handed the check to Scott. He says the check was dated January 30, 1965. Wesley Hart testified that he agreed to purchase 375 shares of stock from Bob Scott. He says he agreed to trade Investors Equity Security stock for Americana Motor Inn stock instead of paying cash. Paul Lenord

Wilson testified that his father, Harvey W. Wilson, purchased stock in the amount of $500 which became part of his estate.

We hold that there is ample and substantial evidence to sustain Gaskin's conviction on five counts for causing unregistered securities to be sold to Woodrome, Stivers, Flowers, Sisk and Hickerson in cases Nos. 6759, 6781, 6789, 6790 and 6792. The judgments on these five counts are hereby affirmed.

As to the remaining convictions on the sales to B. S. Rushing, Dr. Mac McLendon, Ruebin White, Jewell White, Roy Lee and Dan Keating, J. C. and Ruby Neighbors, W. Curtis and Miller Lumber Co. in cases Nos. 6782, 6783, 6784, 6785, 6786, 6788, 6791 and 6793, we are unable to find substantial evidence in the record that the sales in these cases were in excess and in addition to, the 25 sales exempted by the Commissioner. The judgments on these eight counts are reversed.

The State argues that the list of 25 names filed with the Commissioner does not operate as an exemption until and unless the reasons set forth in the application are true, and are in good faith carried out. We do not so interpret the statute. Such interpretation would in effect place the accused in the position of being forced to prove his innocence to avoid conviction, rather than the State being required to prove him guilty before obtaining a conviction. We find no merit to the argument that Gaskin was given a greater sentence at the second trial than at the first. (See *Fuller and Walton* v. *State*, 246 Ark. 681, 439 S. W. 2d 801), certiorari denied November 17, 1969, 90 S. Ct. Reporter 260.

Affirmed in part; reversed in part.